Filed 12/30/21  P. v. Astarita CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br>　　　Plaintiff and Respondent,<br>v.<br><br>THOMAS JAMES ASTARITA,<br>　　　Defendant and Appellant. | A157034<br><br>(Solano County Super.<br> Ct. No. FCR331959) |

Defendant Thomas James Astarita appeals from his conviction by a jury of second degree murder under a theory of implied malice for his killing of a motorist in a vehicle collision he initiated after spending the day drinking in a local bar.  Astarita, relying heavily on the fact that the jury was not also instructed to consider whether he had committed gross vehicular manslaughter while intoxicated, argues his murder conviction is not supported by sufficient evidence of implied malice, and that the prosecutor engaged in misconduct in closing argument and by objecting to the court instructing the jury on the charge of gross vehicular manslaughter while intoxicated, the latter misconduct amplified by the court's decision not to provide that instruction.

We reject Astarita's claims because substantial evidence supports his murder conviction, the prosecutor did nothing improper and California Supreme Court case law makes clear that the trial court could not instruct

1

the jury on the charge of gross vehicular manslaughter while intoxicated in the face of the prosecutor's objection because it is a lesser related charge to murder, not a lesser included one. We affirm the judgment, except that we agree with Astarita that he is entitled to one additional day of custody credit.

## BACKGROUND

In April 2018, the Solano County District Attorney filed an information charging Astarita with one count of murder (Pen. Code, § 187, subd. (a)[1]) related to his causing a car collision on July 31, 2017, that resulted in the death of a motorist, Cynthia Clay. A trial followed, at which the following evidence was presented.

### A. Astarita's Drinking on the Day of the Incident

On July 31, 2017, Astarita, then 65 years old, entered a bar located in a restaurant in Vacaville, California at 11:30 a.m. The bartender testified that during her shift, which ended at 3:00 p.m., Astarita ingested approximately four rounds of "a beer and a shot [of whiskey] at the same time," or eight drinks total. He bought a total of 18 drinks, most of which the bartender recalled and thought were for other bar patrons; she did not recall if other patrons bought Astarita drinks, but said it was possible.

Astarita remained at the bar as another bartender began his shift around 3:00 p.m. That bartender testified that he served Astarita three rounds of beer and whiskey, for a total of six drinks over about three hours. This was a usual amount for Astarita, who "could probably go further and hold himself together very well"; the bartender did not remember "very many times" when he "had to be worried about him." Astarita was a regular who often bought drinks for other patrons. The bartender did not recall if other

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

patrons bought Astarita drinks that day, but thought there was "definitely a chance" that they did.

The bartender further testified that Astarita frequently took a taxi or got a ride from his grandson when he left the bar. As Astarita prepared to leave on this day, another regular "offered him a ride to save him money from a taxi." Initially, the bartender testified that Astarita "just said he was okay from what I remember" and left the bar. After reviewing his statement to an investigating officer a couple of days after the incident, the bartender recalled that Astarita said he had a ride. The bartender testified that, based on the number of drinks he served to Astarita and the blood alcohol legal limit for driving, "for sure, [Astarita] was not able to drive. But physically, mentally, he was carrying himself pretty well."

**B. Astarita Kills Cynthia Clay in a Vehicle Collision.**

At 5:55 p.m. that same day, a married couple, a man and a woman, and their daughters were in the first car in the left turn lane on Marshall Road at the intersection of Marshall and Nut Tree Road in Vacaville, California. They were stopped at a red light next to a Honda Accord. The intersection was about a mile and a half away from the bar where Astarita had been drinking that day. The man and woman testified that when the light turned green, they and the Accord began moving into the intersection when a GMC Yukon came through the red light in the second southbound lane on Nut Tree Road. The man and woman testified that the Yukon's driver, Astarita, did not make any attempt to slow down and that his eyes were open and staring straight ahead. The woman stopped their car but the Honda Accord continued across the intersection. The Yukon crashed loudly into it and became embedded in its side door.

3

Another driver at the intersection, whose first name was Lisa,[2] testified that hers was the second car in her lane stopped at the red light on Marshall at the Nut Tree intersection that day. When the light turned green, she started into the intersection when "a black streak" caught her side vision. She looked and saw a large black SUV "approaching very quickly," which was driven by Astarita. As she stopped, the SUV "came really, really fast across and hit [a] car," and there was an "explosion." Astarita's SUV did not slow down or skid or anything like that.

Cynthia Clay drove the Honda Accord that Astarita struck with his SUV. She was killed as a result of the multiple blunt force injuries she suffered in the collision. She had severe trauma to the head, a skull fracture, extensive fractures to the rib cage, severe damage to the cervical spleen, abrasions, lacerations, bruised lungs and intestines, and tears to the heart and liver.

Lisa testified that she spoke to Astarita for about 20 minutes as he sat in his SUV after the crash. His speech was extremely slurred and he smelled of alcohol. Astarita said "he didn't understand what had happened or how it had happened" and that he had not seen the light turn red. At one point he asked Lisa "if he had done that," referring to the accident. He kept repeating himself and slurring his words.

A police officer responding to the scene spoke to Astarita soon after the collision. The officer smelled a strong odor of alcohol coming from Astarita's breath and from the inside of his vehicle, and noticed Astarita's eyes were watery and his speech was slurred. In the course of the next hour or so, Astarita told the officer he believed he was involved in a crash, was unable to

---

[2] We refer to the witness by her first name to respect her privacy and mean no disrespect by doing so.

describe the car he struck or say whether there were other cars around him at the time, did not know the color of his traffic light, was just "cruising, listening to music" at the time of the collision and did not lose consciousness while he was driving. He said he had had some drinks at a restaurant but could not recall exactly how many. He also said he had not eaten since earlier in that day, in the morning.

The officer used a preliminary alcohol screening device to test two breath samples from Astarita. The blood alcohol results were 0.193 percent and 0.198 percent. He arrested Astarita for driving under the influence and took him to a local hospital.

Blood drawn from Astarita at the hospital at 7:09 p.m. that day had an ethanol concentration of 0.20 percent or 0.22 percent. An expert in alcohol analysis and the effects of alcohol on driving ability testified that such a blood alcohol level for a man of Astarita's size represented "approximately 15 standard drinks in their bloodstream." The expert opined that all individuals are impaired for the purposes of driving at a 0.08 percent blood-alcohol concentration. Further, he said, "in terms of .20 [blood alcohol concentration], your risk of getting into a crash significantly increases. So at .08, your risk increases by about two and a half percent. By the time you reach a .20, your probability of getting in a crash goes up over a hundred, or over a hundred times, basically." A criminalist with expertise in the field of alcohol analysis and the effects of alcohol on the human body testified that a person who has developed some tolerance to alcohol could possibly mask physical impairment, but "they're still mentally impaired."

Another officer investigating the scene determined that the intersection's traffic lights were functioning well and the intersection had no visual obstructions. The weather was clear and the sun was not positioned to

5

be a factor in the collision. There was no evidence of skid marks. Based on the information available to him, he estimated that speed was not a factor in the collision and that Astarita was "going near or around the speed limit."

**C. Astarita's Previous Driving Under the Influence Conviction**

Another witness testified that about four and a half years before the present incident, at around 6:00 p.m. on January 3, 2013, she was stopped at a red light on Nut Tree Road in Vacaville when a car hit hers from behind. She exited her car and walked back to the driver of the car behind her, who was Astarita, and insisted that he had hit her, to which he repeatedly said, " 'No, I didn't.' " She smelled a strong odor of alcohol coming from inside his car.

Astarita left the scene but was soon stopped by a police officer who had seen Astarita's car "bump" into the other car. The officer detected a strong odor of alcoholic beverage on Astarita's breath and observed that his eyes were bloodshot and glassy and his speech was slurred. Astarita did not appear to understand what had happened.

Another investigating officer contacted Astarita as he was seated in his pickup truck and observed that he had slurred speech and red, glassy eyes and smelled of alcohol. Astarita stated that he had drunk "three shots of Patron and four beers." The officer performed three field sobriety tests on Astarita, concluded he was too impaired to drive and arrested him. Subsequent testing determined Astarita had a blood alcohol concentration of 0.22 percent. Astarita pleaded guilty to driving under the influence and executed a plea form, which was entered into evidence in this case. According to the plea form, which the prosecutor read during closing argument without objection, Astarita acknowledged that it was extremely dangerous to human health to drive under the influence of alcohol, and that if

6

he continued to drive under the influence of alcohol and someone was killed, he could be charged with murder. He was convicted of driving under the influence and ordered to attend a program for first-time driving-under-the-influence offenders.

A drug and alcohol counselor testified that Astarita completed the three-month program in June 2013. It consisted of six two-hour weekly classes and nine two-hour group sessions in which participants learned about the effects of alcohol and the consequences of driving under the influence. The counsellor did not have knowledge of what Astarita himself did, but said program participants were asked at the end of the program to confirm in writing that they were aware they could go to jail for another driving under the influence conviction and be charged with manslaughter or murder if they killed someone with their vehicle while under the influence.

### D. Further Trial Proceedings

Astarita presented the testimony of a psychiatrist who was an expert in brain scan analysis and diagnosis. He testified that Astarita suffered a closed head injury in January 2017 and was hospitalized in May 2017. Based on a SPECT scan of Astarita's head, the expert concluded that his frontal lobes might not be operating at the level they should be.

Astarita requested that the court instruct the jury not only on murder, the charge brought by the prosecution, but also on the lesser related charge of gross vehicular manslaughter while intoxicated, which requires only a showing of gross negligence.[3] The prosecution opposed this request, arguing

---

[3] "Gross vehicular manslaughter while intoxicated is the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of Section 23140, 23152, or 23153 of the Vehicle Code, and the killing was either the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence, or the proximate result of the commission of a lawful act that

there was no evidence of gross negligence and that, regardless, charging a lesser related offense was solely within the prosecution's discretion and beyond the power of the court to instruct on without the consent of both parties. The court at first indicated it had the authority to give, and would give, the instruction because substantial evidence supported it doing so. However, after a break in the proceedings, the court concluded it did not have the authority to instruct on the lesser related charge without the consent of both parties and denied Astarita's request. The court decided to instruct on involuntary manslaughter, which is a lesser included offense to murder, based on the evidence of Astarita's head injury.

Subsequently, the court instructed the jury regarding implied malice murder and involuntary manslaughter. It told the jury, "In order to prove murder, the People have the burden of proving beyond a reasonable doubt that the defendant acted with conscious disregard for human life. If the People have not met this burden, you must find the defendant not guilty of murder." The court further instructed that Astarita acted with the implied malice if he intentionally committed an act, the natural and probable consequences of which were dangerous to human life, knew his act was dangerous to human life and deliberately acted with conscious disregard for human life. The court also instructed, "An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter." As for unlawful acts, the jury was to consider whether "defendant committed the misdemeanor of "driving while under the influence of alcohol," committed the misdemeanor of

_____

might produce death, in an unlawful manner, and with gross negligence."
(§ 191.5, subd. (a).)

8

"driving while having a blood alcohol content of 0.08 percent or higher, or the infraction of failing to stop at a red traffic light . . . ."

The jury found Astarita guilty of second degree murder. The trial court sentenced him to 15 years to life in prison.

Astarita filed a timely notice of appeal.

## DISCUSSION

## I.

### *There Was Sufficient Evidence That Astarita Committed Murder.*

Astarita first argues there was insufficient evidence that he acted with the implied malice needed to convict him of murder. We disagree.

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Ramon* (2009) 175 Cal.App.4th 843, 850.) We "must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

As for implied malice, "[m]urder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) Such malice

9

may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. (§ 188, subd. (a)(1), (2).)

Case law further instructs that "[m]alice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 152.) The facts must demonstrate the defendant had a subjective awareness of the risk. (*People v. Watson* (1981) 30 Cal.3d 290, 298 (*Watson*).) "Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed,' " a more culpable state of mind than that of a person who "acts with conscious indifferences to the consequences," who simply thinks, " 'I don't care what happens.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 987-988 (*Olivas*).)

In *Watson*, the court held the defendant could be held over for second degree murder charges based on the defendant's implied malice in the killing of a child while driving under the influence (*Watson*, *supra*, 30 Cal.3d at pp. 293, 300), establishing the so-called "*Watson* murder" in cases involving vehicular killings. (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 677 (*Wolfe*).) The *Watson* court concluded that the "defendant's conduct was sufficiently wanton to hold him on a second degree murder charge." (*Watson*, at p. 300.) The court explained, "Defendant had consumed enough alcohol to raise his blood alcohol content to a level which would support a finding that he was

10

legally intoxicated. He had driven his car to the establishment where he had been drinking, and he must have known that he would have to drive it later. It also may be presumed that defendant was aware of the hazards of driving while intoxicated. As we stated in *Taylor v. Superior Court* (1979) 24 Cal.3d 890, 897: 'One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.' Defendant drove at highly excessive speeds through city streets, an act presenting a great risk of harm or death. Defendant nearly collided with a vehicle after running a red light; he avoided the accident only by skidding to a stop. He thereafter resumed his excessive speed before colliding with the victims' car, and then belatedly again attempted to brake his car before the collision (as evidenced by the extensive skid marks before and after impact) suggesting an actual awareness of the great risk of harm which he had created. In combination, these facts reasonably and readily support a conclusion that defendant acted wantonly and with a conscious disregard for human life." (*Id.* at pp. 300-301.)

Appellate courts have since followed *Watson*. As one observed, "Following the Supreme Court's ruling in *Watson*, appellate courts have upheld numerous murder convictions in cases where defendants have committed homicides while driving under the influence of alcohol. (See, e.g., *People v. Lima* (2004) 118 Cal.App.4th 259; *People v. Autry* (1995) 37 Cal.App.4th 351; *People v. Murray* (1990) 225 Cal.App.3d 734; *People v. McCarnes* (1986) 179 Cal.App.3d 525; [*Olivas, supra,*] 172 Cal.App.3d 984.) Generally, these opinions 'have relied on some or all of the following factors'

11

that were present in *Watson*: '(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.' (*People v. Autry*, *supra*, 37 Cal.App.4th at p. 358.)" (*Wolfe, supra*, 20 Cal.App.5th at pp. 682-683, accord, *People v. Munoz* (2019) 31 Cal.App.5th 143, 152.) The *Wolfe* court noted, that, as another appellate court observed, " 'nowhere does the opinion in *Watson* state that all of the factors present in that case are necessary to a finding of second degree murder. Rather, the opinion states that the presence of those factors was sufficient *in that case . . . .*" (*Wolfe*, at p. 683, quoting *Olivas*, at p. 988, fn. omitted.)[4]

Taking into account the factors outlined in *Wolfe* and other cases as well as the particular facts of this case, we conclude there is substantial evidence that Astarita acted with implied malice. On the day of the incident, Astarita drove to the bar, thereby evidencing an intent to consume alcohol and then drive. There was testimony that he was a regular patron at the bar and typically consumed a lot of alcohol, arranging to get to and from the bar without driving himself. On the day in question, he consumed over the course of about six and a half hours at least the 14 drinks he purchased for himself and possibly more if other patrons purchased additional drinks for him. His drinking raised his blood alcohol level, as measured at the hospital

---

[4] The *Watson* court stated, "We do not suggest that the foregoing facts conclusively demonstrate implied malice, or that the evidence necessarily is sufficient to convict defendant of second degree murder. On the contrary, it may be difficult for the prosecution to carry its burden of establishing implied malice to the moral certainty necessary for a conviction. Moreover, we neither contemplate nor encourage the routine charging of second degree murder in vehicular homicide cases. We merely determine that the evidence before us is sufficient to uphold the second degree murder counts in the information, and to permit the prosecution to prove, if it can, the elements of second degree murder." (*Watson, supra*, 30 Cal.3d at p. 301.)

after the collision, to a level that approached three times the legal limit, meaning 0.20 percent or 0.22 percent. According to a testifying expert, there was a very high risk that a person driving with a blood alcohol level of .20 would cause a car accident.

And indeed, there is substantial evidence that Astarita knew about this high level of risk, knew it could result in death and consciously disregarded this knowledge. Four and a half years earlier, he had similarly driven on Nut Tree Road after drinking what he described as fewer drinks than he consumed in this case, his consumption resulting in a blood alcohol level of 0.22 percent. In that incident, he had hit another car from behind at a stop light. Eyewitness testimony indicated he was so intoxicated at the time that, as in the present case, he did not know what he had done, repeatedly denied hitting the car and appeared to not understand what had happened. The knowledge Astarita gained that day regarding the risk of driving while under the influence is indicated by his acknowledgment on the plea form he signed in 2013 that driving under the influence posed a danger to others. The acknowledgements in the plea form were supplemented by his completion of a three-month program that focused on the dangers of drunk driving and required participants to confirm their awareness that if they killed someone while doing so they could be charged with manslaughter or murder. (See *Wolfe*, *supra*, 20 Cal.App.5th at p. 683 ["a jury can infer defendant's knowledge from exposure to drinking and driving educational programs"].)

Besides the evidence that he knew of the danger, there is also substantial evidence that Astarita deliberately chose to drive that day while consciously disregarding the risk. He had frequently taken a taxi or asked his grandson to drive him home when he had been drinking at the bar. On the day of the incident, he rejected an offer of a ride from another patron and

13

told the bartender he already had a ride, thus hiding his intention to drive from those concerned about his intoxicated state. Astarita concedes that it can be reasonably inferred from this evidence that he knew it was dangerous for him to drive in the state of intoxication he was in at the time.

A witness, Lisa, and an investigating officer testified that in the period immediately after the deadly collision, Astarita was in a confused and highly intoxicated condition, slurred his words and indicated that he did not know what had just happened. Also, Lisa and two other eyewitnesses indicated that despite staring straight ahead, Astarita made no effort to slow down before he crashed into the Accord, killing Cynthia Clay. This testimony was corroborated by the absence of any skid marks at the scene. This is further evidence that he chose to drive with a conscious disregard for the safety of others.

Finally, there is substantial evidence that Astarita was driving at a dangerous rate of speed. Lisa recalled that Astarita's car first appeared to her as "a black streak" and that she saw it come "really, really fast" and hit a car. It can be reasonably inferred that Astarita was driving faster than the normal flow of traffic and thereby creating a hazard, whether or not he was exceeding the speed limit. Further, he ran a red light and failed to slow down at all before hitting the car crossing through the intersection in front of him.

Astarita's arguments that there was insufficient evidence of his implied malice are unpersuasive and ignore the evidence we have just described. He contends the evidence showed only gross vehicular manslaughter while intoxicated, a theory on which the jury was not instructed; his references to the requirements for such a charge are not relevant to whether substantial evidence supports the jury's finding of implied malice. Astarita minimizes the evidence of his extreme intoxication at the time of the collision (as

14

indicated by his .20 percent or .22 percent blood alcohol concentration), asserts there was no evidence that he was driving erratically or recklessly on the day of the incident, contends that he was guilty of merely "[i]nadvertently running a red light due to inattention," dismisses his prior collision in 2013 as a "minor accident" and argues that, while he had knowledge of the dangers of driving, this does not show that his decision to drive that day entailed conscious disregard for human life. None of these contentions are borne out by the substantial evidence we have just discussed.

Astarita also argues that "wanton" driving behavior requires evidence of "highly dangerous driving," such as "driving excessively over the speed limit, driving against oncoming traffic, driving erratically to evade police, or continuing to drive erratically despite near misses." Otherwise, he contends, everyone who drives under the influence and kills someone would be guilty of murder rather than gross vehicular manslaughter while intoxicated.

This argument is unpersuasive. In considering different jury instruction formulations regarding implied malice, our Supreme Court has held that "wanton disregard" is essentially the same as "conscious disregard." (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1221.) The court noted that "wanton" has been defined " 'in the common law as involving an element of "consciousness of one's conduct" and "realization of the probable injury to another." ' " (*Id.* at p. 1220.) The court held that, because "wanton" is not a term "in common use in contemporary daily speech," "[t]he better practice . . . is to charge juries solely in the straightforward language of the 'conscious disregard for human life' definition of implied malice." (*Id.* at p. 1221.) As we have discussed, there is substantial evidence that Astarita engaged in such a conscious disregard for human life.

15

Further, appellate courts after *Watson* have considered certain factors based on that court's discussion of the facts before it. (See, e.g., *Wolfe, supra*, 20 Cal.App.5th at pp. 682-683.) However, courts have also pointed out that our Supreme Court in *Watson* "deliberately decline[ed] to prescribe a formula . . . , instead requiring a case-by-case approach." (*People v. Olivas, supra*, 172 Cal.App.3d at p. 989; see also *People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1091 [" '*Watson* . . . deliberately declin[ed] to prescribe a formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach' "].) Here, as we have discussed, there is substantial evidence that Astarita *was* engaging in dangerous driving by choosing to drive in an extremely intoxicated state at a relatively high speed, running a red light and failing to slow down despite looking straight ahead at a car crossing directly in front of him, all of which caused him to hit Cynthia's Clay's Honda Accord with an explosive force, killing her. Astarita fails to grapple with this substantial evidence.

Finally, Astarita is wrong that nothing sets this case apart from any other case involving a death resulting from driving under the influence. The fact that Astarita was convicted of driving under the influence in a similar situation four and a half years prior to the incident in this case and was required to acknowledge the risks of death to others and complete a course focused on such dangers presumably brought those risks home to him in a way that went beyond the kind of general knowledge of them that almost everyone possesses. He was forced to think about them and, in effect, study them, and must have understood that driving while highly intoxicated was essentially a recipe for killing another person. That he well understood the degree of risk he was taking is further evidenced by his getting others to drive him home from the bar on prior occasions and his concealment from the

16

bartender and a patron who offered him a ride of his intent to drive himself home.

In short, Astarita's contentions are unpersuasive. Substantial evidence shows he acted wantonly, that is, with a conscious disregard of human life.

## II.

### *Astarita Has Forfeited His Prosecutorial Misconduct Claim, Which Also Lacks Merit.*

Astarita next argues that the prosecution committed prejudicial misconduct during closing argument by purportedly arguing that "the difference between involuntary manslaughter and implied malice murder was whether the driver was sober." He further contends that the court, by its murder instruction and failure to also instruct on gross vehicular manslaughter while intoxicated, amplified the prosecutor's invitation that the jury convict Astarita "based solely on the fact that he deliberately drove while under the influence."

The People argue that Astarita has forfeited this claim by not raising it below and that the claim in any event lacks merit. We agree with the People that Astarita's claims provide no basis for reversal.

### A. The Prosecutor's Purported Misconduct

Astarita focuses his misconduct claims on two different categories of remarks made by the prosecutor in closing argument. First, the prosecutor, in his initial closing argument, referring to the requirement that he prove Astarita's subjective knowledge of the dangers his driving while under the influence posed, said, "Did the defendant know that the act of driving while intoxicated is dangerous to human life? Well, absolutely. First of all, we all really all know that. You don't have to be convicted of a DUI to know that driving while intoxicated is dangerous to human life. [¶] We've seen a generation of M.A.D.D. ads showing us pictures of how dangerous it is.

17

Mangled cars. . . . We read in the paper about people getting killed all the time. Unless the defendant has been living under a rock, he knows that driving while intoxicated is dangerous." Then, after referring to Astarita's previous conviction for driving under the influence and the 2013 court-ordered programming he completed, the prosecutor said, "Did the defendant know that driving while intoxicated is dangerous to human life? Absolutely he did." The prosecutor also argued the jury could infer Astarita deliberately disregarded the risk of driving while intoxicated because he lied about having a ride as he left the bar, indicating he knew it was dangerous to drive. There was no objection by defense counsel to any of the prosecutor's remarks.

Astarita contends these remarks were misconduct because they suggested that he was guilty of murder simply because he knew drunk driving was dangerous and did it anyway and because they implied that implied malice could be based on negligence rather than requiring conscious disregard of the dangers to others.

Second, in rebuttal, the prosecutor discussed involuntary manslaughter, giving as an example a driver who is sober and becomes momentarily distracted by a bird or fancy car and inadvertently drives through a stop sign. Defense counsel objected, contending counsel had misstated the law. The court overruled the objection and the prosecutor completed his example, in which the driver, upon driving through the stop sign, collides with another car, resulting in a death.

The prosecutor then gave an example of a person driving while sober but texting or emailing who drives through a stop sign and kills someone in a collision, after causing a previous serious accident doing the same things. The prosecutor concluded, "And so at the time this second time occurred, I already knew that doing what I am doing, not paying attention to the road,

18

driving while texting, and Facebooking and emailing, I now know that that's dangerous to human life. And I know that because I was in a previous accident. And if I know that it's dangerous and I continue doing my bad behavior, and it happens again, now that's implied malice murder.

Astarita contends these rebuttal remarks wrongly suggested that involuntary manslaughter could not apply in this case. Specifically, he contends the prosecutor improperly argued in effect that the difference between implied malice murder and manslaughter was whether "the defendant was intoxicated or sober when he ran the red light and that any accident caused by a drunk driver was necessarily implied malice murder."

## B. Astarita Has Forfeited Some of His Misconduct Claims.

Astarita has forfeited his claims based on the prosecutor's first category of remarks by failing to first object on the same grounds below and request that the trial court admonish the jury. However, he preserved his claims regarding the second category.

"Generally, ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' [Citation.] This general rule, however, does not apply if . . . the trial court promptly overrules an objection and the defendant has no opportunity to request an admonition." (*People v. McDermott* (2002) 28 Cal.4th 946, 1001, accord, *People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).)

Here, Astarita did not object below at all to the first category of remarks. Therefore, he has forfeited his claims regarding these remarks. Astarita points out that his counsel was entitled to elect to address the first category of the prosecutor's remarks in his own closing argument, citing

19

*People v. Centeno* (2014) 60 Cal.4th 659, 676. *Centeno* discusses this matter regarding an ineffective assistance of counsel issue and, therefore, is inapposite.

As for the second category of remarks Astarita highlights, we agree with him that his objection that the prosecutor was misstating the law regarding involuntary manslaughter preserved his claims related to these remarks. His objection was sufficient under the circumstances, and the court's immediate rejection of it released him from the obligation to seek an admonishment.

## C.  The Prosecutor Did Not Engage in Misconduct

Even if Astarita had not forfeited his claims regarding the first category of the prosecutor's remarks, we would reject those claims because they, as well as his claims regarding the second category of remarks, lack merit.

"The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] . . . Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Samayoa, supra,* 15 Cal.4th at p. 841.)

20

" '[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements.' " (*People v. Hill* (1998) 17 Cal.4th 800, 829-830.)  However, " ' " 'a prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*Id.* at p. 819.) Further, " 'the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made.' " (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1224, fn. 21, superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.)

Astarita's claim that the prosecutor wrongly argued he was guilty of murder simply because he drove under the influence knowing it was dangerous is based on a couple of summary remarks by the prosecutor that Astarita takes out of context.  The prosecutor extensively reviewed the evidence of Astarita's very high blood alcohol level shortly after the incident, his lying about having a ride from the bar and his highly dangerous driving to contend that he acted with conscious disregard of other's safety.  The prosecutor also highlighted Astarita's 2013 arrest and conviction for driving under the influence, contending that it "put the defendant on notice that he cannot safely operate a vehicle after having 15 drinks."  To the extent the prosecutor's two summary remarks are ambiguous, we do not think they misled the jury in any way.  (See *People v. Gonzalez*, *supra*, 51 Cal.3d at p. 1224, fn. 21 [" '[A] court should not lightly infer that a prosecutor intend[ed] an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations' "].)

Also, the prosecutor's statements about Astarita's, and everyone's, general knowledge of the dangers of driving under the influence were unlikely to mislead the jury into applying an objective reasonable person standard in determining what Astarita knew on the day of the incident. The prosecutor extensively argued that Astarita not only knew generally that driving under the influence was dangerous, but that he had knowledge of the dangers of his specifically doing so based on his own experience. This included not only the facts of his previous conviction, but also the cautions he received in the course of the 2013 legal proceedings and in the court-ordered program he completed.

Finally, the prosecutor's rebuttal examples regarding involuntary manslaughter and implied malice murder did not draw a line between a person's sober and drunken states. To the contrary, both examples given by the prosecutor involved persons in sober states. Also, the prosecutor's remarks focused not on Astarita's extreme intoxication per se, but on the dangers it created and what it meant to act in conscious disregard of others' safety. For example, the prosecutor said about Astarita, "When he says, I've got a ride, he's indirectly saying I know it's dangerous . . . ." And the prosecutor concluded, "Conscious disregard. Again, another legalese term. 'Conscious' means he's aware. 'Disregard' means he's choosing to ignore it. He knew as he was leaving the bar that there were concerns about his ability to drive, and he knew exactly what he was saying because he said I've got a ride. So he knew of the risks because he had been advised over and over and over again. [¶] And, again, we don't have to be advised that driving while intoxicated is dangerous, but he was advised. And he consciously—he intentionally chose to disregard that knowledge that it's dangerous. He got in his car and he drove." In short, there is no reasonable likelihood that the

22

jury would have construed any of the prosecutor's remarks in an improper manner.

As for the court's jury instructions, Astarita fails to point out anything improper about the instructions the court gave; rather, he contends that the court's failure to instruct on gross vehicular manslaughter while intoxicated, combined with the prosecutor's purported misconduct, amplified the prosecutor's misconduct and was thus erroneous. This argument lacks merit.

A trial court has a sua sponte duty to instruct the jury on a lesser included offense "when evidence exists that would justify a conviction on the lesser offense." (*People v. Yoeman* (2003) 31 Cal.4th 93, 129.) But "a defendant has no unilateral right to an instruction on an uncharged offense that is not necessarily included within the charged offense." (*Ibid.*) Gross vehicular manslaughter while intoxicated is not a lesser included offense to murder because it "requires proof of elements that are not necessary to a murder conviction. The use of a vehicle while intoxicated is not merely a 'circumstance,' but an element of proof when the charge is gross vehicular manslaughter while intoxicated. Gross vehicular manslaughter while intoxicated is not merely a degree of murder, nor is it a crime with a lengthy pedigree as a lesser included offense within the crime of murder." (*People v. Sanchez* (2001) 24 Cal.4th 983, 991.) Therefore, it "should not be treated as a lesser included offense to murder." (*Id.* at p. 992.) Rather, gross vehicular manslaughter is a "lesser related . . . offense" to murder (*People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1116 [citing *Sanchez*], disapproved on another ground in *People v. Hicks* (2017) 4 Cal.5th 203, 214, fn. 3.)

Unlike lesser included offenses, lesser related offenses are offenses that "are *not* necessarily included in the stated charge, but merely bear some conceptual and evidentiary 'relationship' thereto." (*People v. Birks* (1998)

23

19 Cal.4th 108, 112 (*Birks*).) Our Supreme Court has repeatedly held that a defendant has no unilateral right to an instruction on lesser related offenses, which instruction "is proper only upon the mutual assent of the parties." (*People v. Taylor* (2010) 48 Cal.4th 574, 622 [citing *Birks*]; *People v. Rangel* (2016) 62 Cal.4th 1192, 1230 [quoting *Taylor*]; *People v. Jennings* (2010) 50 Cal.4th 616, 668 [no right to instructions on lesser related offenses even if supported by substantial evidence "because California law does not permit a court to instruct concerning an uncharged lesser related crime unless agreed to by both parties"]; see also *Birks*, at pp. 112-113, 131 ["[o]nce the relative precision of necessary inclusion is left behind, the parties and the courts are cast adrift in a trackless sea," having "no clear standards for determining" what lesser offenses are related "for instructional purposes"].) Therefore, Astarita's claim that the trial court somehow erred by not instructing on gross vehicular manslaughter while intoxicated or gross negligence is without merit.

Astarita also compares this case to *People v. Medellin* (2020) 45 Cal.App.5th 519. There, the appellate court held that a combination of the prosecutor's misstatement of law coupled with an ambiguous pattern instruction resulted in invalid legal theory error. (*Id*. at pp. 532-535.) The case is inapposite because the prosecutor here did not misstate the law, and there was nothing ambiguous about the court's instructions.

In short, Astarita has forfeited some of his prosecutorial misconduct claims and, regardless, they all are without merit.[5]

---

[5] In light of our conclusions, we do not discuss Astarita's contentions that the purported misconduct and court error were prejudicial.

## III.

### *The Prosecution Did Not Engage in Misconduct by Objecting to a Jury Instruction on Gross Vehicular Manslaughter While Intoxicated.*

Related to his contention that the trial court should have instructed the jury regarding gross vehicular manslaughter while intoxicated, Astarita makes the novel argument that the prosecutor also engaged in misconduct by objecting to instructing the jury on gross vehicular manslaughter while intoxicated after the defense requested it. Astarita contends that by doing so, the prosecutor somehow violated his constitutional due process right to a fair trial. This argument is also unpersuasive.[6]

We have already reviewed in the previous subpart the law regarding the kind of behavior necessary to constitute prosecutorial misconduct (see *Samayoa*, *supra*, 15 Cal.4th at p. 841), as well as our Supreme Court's repeated directives that a trial court should not instruct the jury on the lesser related charge of gross vehicular manslaughter while intoxicated without the mutual assent of the parties. (See *Birks*, *supra*, 19 Cal.4th at p. 112; *People v. Taylor*, *supra*, 48 Cal.4th at p. 622; *People v. Rangel*, *supra*, 62 Cal.4th at p. 1230; *People v. Jennings*, *supra*, 50 Cal.4th at p. 668.) Further, as Astarita acknowledges, "[i]n the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion,' " " 'subject to constitutional restraints,' " including "the equal protection component of the Due Process clause of the Fifth Amendment." (*United States v. Armstrong* (1996) 517 U.S. 456, 464.)

---

[6] In light of our conclusions, we again do not discuss Astarita's contentions that the purported misconduct was prejudicial.

25

Astarita does not contend that the prosecutor violated his right to equal protection. Rather, he contends, without citing any relevant authority, that the prosecutor's objection to instructing the jury on gross vehicular manslaughter while intoxicated "increase[d] the likelihood of a conviction of murder by obfuscating the distinction between gross negligence [required for a gross vehicular manslaughter while intoxicated conviction] and . . . implied malice for *Watson* murder charges." (Footnote omitted). According to Astarita, the prosecutor thereby created an "all-or-nothing" dilemma for the jury that "distort[ed] the fact-finding process." He contends case law suggests that "[a] jury who is not provide[d] with a charge of gross vehicular manslaughter will be more likely to find implied malice than a jury who is instructed on the principle of gross negligence, even when considering the exact same evidence." He concludes that a prosecutor's "exercise of discretion that lessens the burden of proof and causes an unfair trial . . . is unconstitutional. The prosecutor cannot attempt to achieve a questionable murder conviction by intentionally depriving the jury of the option to consider whether the conduct only amounts to gross vehicular manslaughter. Therefore, in DUI homicide case[s] generally, and particularly in this case, the prosecutor abuses its discretion in violation of the defendant's right to due process by refusing to allow a charge of vehicular manslaughter where the jury could find gross negligence while having a doubt as to implied malice."

Astarita does not argue that the prosecutor lacked probable cause to charge Astarita with murder or that the prosecutor or the trial court did anything to lessen the prosecutor's burden of proof regarding that charge (other than, he contends, to limit the charges considered by the jury to murder and involuntary manslaughter). Further, as we have also discussed,

26

substantial evidence supports Astarita's murder conviction.  Rather, as he all but acknowledges, Astarita's argument constitutes a request for a judicial rule that in all *Watson* murder cases, the People must consent to instructing the jury on gross vehicular manslaughter while intoxicated.  Such a rule would be contrary to our Supreme Court's holding that a trial court should not instruct on lesser related charges without the mutual assent of the parties.  Therefore, we are prohibited from adopting it under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.

Further, we note the rejection by our colleagues in the Second Appellate District of a similar claim by a defendant that "it was fundamentally unfair for the prosecution to charge him with a *Watson* murder, then deny him a [gross vehicular] manslaughter instruction as a lesser included offense by omitting allegations of drinking and driving from the information," thereby engaging in a " 'manipulation of the charging procedures.' " (*People v. Munoz*, *supra*, 31 Cal.App.5th at p. 163.)  After reviewing the law regarding a prosecutor's broad discretion in charging a defendant and our Supreme Court's prohibition of a trial court's instruction on lesser related charges without the asset of both parties, the court concluded, "[The defendant's] argument asks us to cast ourselves into *Birks'*s 'trackless sea' to determine if, based on the evidence in a given case, the prosecution in fairness should have charged additional crimes or consented to additional instructions.  This is no different than requiring trial courts to review the record and instruct on uncharged but not necessarily included offenses supported by the evidence, something clearly not permitted under *Birks*." (*Id*. at pp. 163-164.)  Similarly, here, Astarita would have us ignore clear Supreme Court precedent to establish a judicial rule that would create a

27

tangle of questions generally in our jurisprudence regarding the charging and instructing on lesser related offenses. This we cannot do.

**IV.**

**Astarita Is Entitled to One Additional Day of Custody Credits.**

Finally, Astarita and the People both contend he is entitled to one additional day of actual custody credit. We agree.

"A defendant is entitled to actual custody credit for 'all days in custody' in county jail and residential treatment facilities, including partial days." (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48; §§ 4019, 2900.5, subd. (a).) "Calculation of custody credit begins on the day of arrest and continues through the day of sentencing." (*Rajanayagam,* at p. 48.) " 'The law takes no notice of fractions of a day. Any fraction of a day is deemed a day . . . .' " (*People v. Smith* (1989) 211 Cal.App.3d 523, 526.)

Astarita was arrested and transported to the hospital for medical clearance on July 31, 2017. His sentencing took place on March 15, 2019, after he had spent 593 days in custody. However, at sentencing, the trial court awarded him actual custody credits of only 592 days. Therefore, he is entitled to one additional day of custody credit.

Although section 1237.1 generally requires a defendant to seek correction of credits in the trial court before the error may be raised on appeal, a defendant may raise the issue directly in the appellate court first where it is raised in addition to other non-credit issues for the sake of judicial efficiency. (*People v. Acosta* (1997) 48 Cal.App.4th 411, 427.) Further, an incorrect award of presentence custody credits is an unauthorized sentence which may be corrected at any time. (*People v. Gisbert* (2012) 205 Cal.App.4th 277, 282.) We shall, therefore, order its correction.

## DISPOSITION

We affirm the judgment, except that we modify the judgment to reflect one additional day of custody credit. The trial court is directed to prepare an amended abstract of judgment reflecting this modification and forward a copy of this abstract to the California Department of Corrections and Rehabilitation.

_____
STEWART, J.

We concur.

_____
RICHMAN, Acting P.J.

_____
MILLER, J.

*People v. Astarita* (A157034)

30